WILLIAM HENRY AND OTHERS *v.* DANIEL JACKSON AND OTHERS.

[IN CHANCERY.]

*Evidence. Union Store Association. Agency.*

Evidence of the custom of doing business in a union store association, whose constitution and all rights and duties under it stand wholly upon agreement and consent, and not at all upon law or acts of incorporation, is admissible to show consent to or acquiescence in a practical and actual modification or change of their by-laws.

The directors of such an association should not be held to a strict performance of all the duties prescribed for them in the by-laws, as in case of trustees or directors of a private corporation, when it appears that those duties were mainly transferred by the association to an agent, and the members thereof knew how the business was being managed, and of the deviations from the by-laws, and acquiesced in the same.

The directors could not be held responsible for bad debts occasioned by allowing the agent to sell on credit; nor for depreciation of stock; nor for error in estimates of current expenses; nor for fixing the prices of goods too low to pay current expenses, this subject having been discussed in the meetings of the division, and all members having shared in proportion to their purchases in the advantage of buying cheap.

In assessing the losses upon members, those who left the state before the business of the division was closed, and are now beyond the reach of process, should be left out of the computation.

BILL IN CHANCERY.*

ALDIS, J. The bill seeks to charge the defendants with their shares of the losses sustained in the management of an union store at Westford from June 1st, 1851, to August 20th, 1856.

The defendants insist they ought not to contribute to make up these losses because they have arisen from the negligence of three of the orators—Beach, Henry and Bellows—in the discharge of their duty as directors.

I. The defendants claim that this fact of negligence has been found by the master appointed to take the account. We are clear however that that subject was not referred to him. That is the vital point of defence made in the answers—the leading and material question in issue upon which the court, and not the master, is called upon to decide. The order of reference does not refer it to him

* None of the papers in this case, except the opinion of the court delivered by Judge ALDIS, were sent to the reporter.

for consideration. His finding upon this question, whether founded upon the evidence now before us or upon other proofs not before us we cannot tell, must be laid out of the case.

II. To determine this question of negligence we must ascertain what were the respective rights and duties of the directors of the division and of the agents; then the losses, from what causes they arose and whether from the negligence of the directors so as to make them chargeable.

The defendants claim that the directors should be held to the strict performance of all the duties prescribed for them in the by-laws; and that they are responsible for the same measure of diligence that the trustees and directors of private corporations are.

But in regard to this association it is to be observed that their constitution and all their rights and duties under it stand wholly upon agreement and consent—not at all upon law or acts of incorporation. Hence evidence of their custom—of their established and uniform mode of doing business—becomes admissible to show consent to or acquiescence in a practice and actual modification or change of their by-laws.

If these directors were to be held liable for the performance of the duties and the exercise of the powers named in their written articles, I should find it very difficult to say that they had not grossly neglected them, and had not contributed at least to increase the losses by erroneously reporting the condition of the business to be safe and prosperous, and so prolonging the existence of the association.

But the court does not take this view of their duties, nor consider that the evidence shows such negligence of the real and actual duties imposed upon and expected of them, as should subject them to its losses.

Without attempting any reference in detail to the great volume of evidence and exhibits, we will briefly refer to those more obvious matters appearing in the nature of the organization, its character, object, written articles, real necessities and in the character of the men who composed it and of their uniform mode of doing business, which lead us to conclude that it would not be just to charge the three directors with these losses.

First. Their business was to buy goods and sell them to the members, and sell the products of the members, so as to save to themselves some of the profits which are usually paid to the merchants. But the members appear, all of them, to have been farmers and mechanics wholly ignorant of this kind of trade. The directors were known to be equally ignorant of the business, and reluctant to enter upon the duties of their office.

Their constitution is quite full and minute in establishing rules fit for a debating society, but wholly silent upon points the most vital to their pecuniary welfare. They propose to establish a country store to sell goods much cheaper than other stores, yet nothing is said as to how a sufficient capital—the first element of success—is to be provided. The $10. admission fee, of which $7. might at any time be withdrawn, is too insignificant a contribution to this end to be regarded. This important matter is left open for practical adjustment by the division, to be solved by borrowing money or buying on a credit as best they might. How far want of capital, the necessity of borrowing, perhaps of usurers ; or buying upon credit poor goods at high prices may have contributed to loss it is impossible to tell. The theory of trade upon which the association was founded seems to have excluded, practically, at least to a great extent, a consideration of this point.

It must have been obvious at the outset that they must have an agent or clerk to tend the store and sell the goods, to judge as to whom to trust and to collect debts—to see to the replenishing of the stock and buying goods in market. It could not be expected that directors would do more than advise and oversee in these matters. Yet this vital point is only incidentally alluded to in one of the articles. He who is practically the most important officer of the company—the real manager of the whole business—is not referred to as an officer of the division. Although his duties comprise almost the whole work to be done, nothing is said as to how he shall be employed, or what he shall do, or what record or report he shall make of his doings. This palpable omission in the constitution began to show itself and to call for relief at the beginning of the business. When directors were chosen, upon whom the written articles imposed these duties in part, they hesitated to accept, said they were unskilful

and inexperienced; and then at the first meeting it was talked up (as the witnesses say) that an agent must be hired to attend to the business, and that there would not be much for the directors to do. This agent should buy and sell goods and make the inventories. From that first meeting agents were hired, and did in fact manage the whole business unless it was to borrow money—made the direct-ors' reports and read them to the meeting.    We cannot think but that every member of the association knew full well how all the business was done, and that the written regulations as to the duties of the directors were not expected to be lived up to.    Witnesses may be asked whether to their knowledge the members knew that the direc-tors did not perform the duties named in the articles, and may be obliged to say in truth that they cannot say that the members did know of it.    But when we consider that these duties if performed would constantly have brought the knowledge that they were so per-formed to the members, and that from the beginning they were not performed at all for a period of over five years—that the division held monthly meetings at which it was expressly provided that they might require reports from the directors, and none ever were required —it is impossible for the mind to feel that the members did not know that the directors were not expected to come up to the standard of the constitution ;—that in fact all acquiesced in having the business done as it was practically done.

By the by-laws and by the practice of the association the mem-bers had the right to examine the books and papers of the officers, and in this respect we think had much more extensive rights than have the members of ordinary corporations.    So too it is obvious that the division was expected to exercise a much more direct con-trol and constant supervision of business matters, than do the mem-bers or stockholders of common joint stock companies.    The division was to hold monthly meetings, and business of great importance was not to be disposed of till considered at two regular meetings. The by-laws provide with much minuteness how these meetings shall be held and managed, and that a secretary shall record their doings.    Frequent meetings appear to have been held; but the record of their doings is either not kept at all, or so imperfectly that nothing can be gathered from them of any value in the de-

termination of the case, except what refers to the purchase of the store.

In this absence of records the testimony of witnesses shows that the division in the monthly meetings of its members directed as to the raising of money, the hiring of agents to buy and sell goods, to transact the business of the concern and to make inventories,—and to fix the prices at which goods should be sold to the members and to others.

The directors were by the by-laws to inspect the books once a month—to take an account of stock once in three months and report to the division quarterly, or oftener if the division required. They never in fact did these duties oftener than once a year, yet the division never required them to either examine or report oftener; nor does it appear that any member ever objected to this omission, or moved that the directors comply with the written articles. When they did make their reports they relied mainly upon the agents, and the agents made up the reports and read them to the meetings as directors' reports.

The reports which were made were obviously most meagre, indefinite and blundering; they could not have been satisfactory to any persons at all skilled in mercantile business. They contain manifest errors and blunders, such as plainly spring from incompetency—not from dishonesty; and yet they never seem to have attracted attention or awakened suspicion.

Whether we look at the conduct of the division, of its officers and of the agent, or at the practical operation of the association, we see from first to last an entire disregard of the by-laws in all those important matters that directly affected the pecuniary condition of the company and which were intended theoretically as the safeguards of its prosperity; and the substitution in their place of the employment of an agent and blind and implicit reliance in his management and reports. For this change in the practical working of the business we do not think the directors were chiefly or mainly to blame. It was partly the fault of the division, and mainly the inevitable and natural result of the system. It was the attempt of men to carry on a business of which they were wholly ignorant; it proceeded as all such attempts must, by relying upon others, who, they supposed, un-

derstood the business and would carry it on faithfully, but who had not the stimulus of a personal interest in the enterprise, and it ended as such enterprises usually do in bankruptcy.

To throw the burden of such losses upon the directors alone would seem to us a plain injustice.

We have thus briefly indicated the impression which the evidence in the case has produced upon our minds, as to what was the actual operation of the business, and what as we esteem it was the practical abandonment by the division of the articles of their association which pertain to the management of their affairs. We have examined the testimony and the exhibits as carefully as our time would allow and without going into a detailed commentary on the evidence, thus briefly state our result.

We deem it our duty however to make some reference to the losses and their connection with the alleged negligence of the directors.

The business was carried on about five years and three months. The losses during that time (aside from the purchase of the store) were $2,512.33.

The bad debts were about $450. This was a loss not occasioned by the directors, but by the employment of an agent and allowing him to sell goods on credit. It does not appear that any one was negligent herein ; it was a loss to be expected if goods were sold on trust.

A large loss must have arisen from the depreciation of stock. The goods on hand when the business was closed were sold at ten per cent. discount from their cost. So in making up the annual inventories it would seem that no allowance was made for the depreciation in value of goods on hand, obviously a source of error. There is nothing from which we are able to satisfy ourselves as to what the loss from this source was.

It is said in the master's report that the losses occurred in the ordinary way from the current expenses exceeding the income ; and it is urged by the defendants that this was a steady drain from the beginning upon the resources of the company, and one which could have been easily discovered ; and then could have been remedied by raising the prices at which the goods were sold. We think that in

fact the excess of current expenses over the profits from the sales was one cause of loss. The expenses of the concern were in the main interest on borrowed capital, salary of agent, rent of store and incidental expenses which it would seem might easily have been ascertained. The profits on sales should have been estimated high enough to cover all these safely. But when we consider how conjectural such estimates must have been in the outset—how few data the directors had upon which to base estimates—how unskilled they were in the business—and we may add how desirous all the members must have been "to secure the commodities of life upon the best possible terms," the causes of error are apparent in spite of the best efforts to judge aright and the exercise of their best care. Nor are we satisfied that the losses all arose from expenses exceeding profits. The tables of losses and gains in the master's report do not seem to be quite consistent with this theory. Thus in 1851 from May to December there was a loss of $132. From December, 1851, to December, 1852, there was a gain of $200. The next year a loss of $419., and then in three months and twelve days a loss of $690., then in nine months more only a loss of $164. These fluctuations seem too great and sudden to be accounted for by the mere operation of the excess of ordinary expenses over ordinary profits. We think there must be losses not yet explained.

Again the conditions upon which goods should be sold to members and to others was the theme of discussion in the meetings of the division. That the terms on which members bought and how much they were preferred were known to all the members seems indisputable. If the goods were sold too low, at prices not sufficiently remunerative to the division, all the members shared in this advantage of buying cheap in proportion to their purchases, though their gain in this respect proved ultimately a loss to the division. It does not seem just to us that losses arising to the division in this manner should be cast upon the directors.

In thus reviewing the causes of the losses we are unable to find a single instance in which the losses can be directly traced to the negligence of the directors.

If they are to be made liable at all it must be upon the ground that they ought to have examined the condition of their affairs—

have found out that they were losing—reported to the division, and thus enabled the members to close the business, or to increase the prices at which goods were sold; but as to this claim of the defendants we have already indicated our opinion.

As to Jackson and Allen, we are satisfied that they both were members of the division,—that Jackson signed the articles and that Allen paid his admission fee and acted as a member.

It appears that three of the members, Goodhue, Hill and Osgood reside out of the state—at the west (Illinois,) and removed from the state before the business of the division was closed, or the orators could have called on them for contribution. Regarding them as thus wholly beyond the reach of process, and that the orators have no practicable means of enforcing contribution to which they can be reasonably required to resort, we think for the purposes of a decree in this case they must be left out of the computation.

Much testimony was taken as to the purchase of the store and the consequent loss.

That the directors in making this purchase were directed by the vote of the division seems to us satisfactorily proved—that the requisite number of meetings were held and the requisite number of members attended. The purchase at the time seems to have been a good one;—the property was then worth, and for more than two years thereafter and up to the time the division stopped business, all that was paid for it. Nor are we satisfied that any objection was made by any one but those who about that time withdrew and are not made chargeable with loss on account of the purchase. For their shares in this loss the defendants Allen, Jackson and Rice should contribute as stated in the master's report. We think too the loss ought to be borne by those who were members at the time of dissolution and should not include the Chases, Partridge and Castle who left before that time—all but Castle in 1854; for there was no loss on the property up to that time.

As to interest. If interest has been twice cast and included in the price of the store, as claimed in the brief of the counsel for the defendants, it is clearly an error. But as we understand the master's report the price of the store was not included in the loss of

$2512.33 reported by the master, but is kept wholly separate from that sum.

If the directors paid $1650. for the store, or became liable so to do on the 15th of April, 1854, that sum should be on interest from that date because the directors have had to pay interest from that date. While the store was used by the division no rents would be received. After that whenever rents were received they should have been applied when received by the directors to pay for the store. So of the $1006.75. received on the sale of the store. The sums paid for insurance, &c., on the store should be added to the cost of the store, with interest from the time they were paid. If the master has not in his computations proceeded substantially on these principles, the report in this respect should be corrected. He does not say whether interest is computed by him on the rents of the store received by the directors from the times they were received to December 1st, 1863, in making up the sum of $842.50. (which would be the same thing as applying them when received)—or is not. We cannot say there is error in that respect—but it can be readily ascertained and if erroneous corrected by the chancellor.

The question of costs we think best to remand to the chancellor according to the stipulation of the parties.

Decree affirmed and case remanded, the question of costs to be determined by the chancellor, and computation of interest to be reviewed, and if erroneous, to be corrected according to the rules prescribed by this court.